Ruffin, C. J.
 

 We think the witness, Hill, was competent. In
 
 Allen's case,
 
 1 Hawks, 6, the only ground, on which the witness judged, was the hand-writing in the signatures to the note ; and the court thought their opportunities of gaining a correct knowledge of that were not sufficient. That case went very far in restricting the evidence, as it seems to us. Many persons, indeed, pay very little attention to hand writing, and handle bank notes without retaining any exemplar in the mind, and such persons may well say they are not well acquainted with the hand writing, and ought not to be allowed to testify to it. But it would seem to be otherwise as to those, who, under such circumstances, do attend to the signatures and other properties of the notes, so as to give a correct knowledge of them. For one, who has been in the habit of receiving large sums in bank notes, and passing them
 
 *292
 
 oil at periods, from which every one must know that, in the course of trade, many, if not all of them,
 
 must
 
 long ago have been presented at the bank whence they were issued, and who
 
 r J
 
 ; has no reason to suppose that payment of a single one of them was refused, may well be considered in the light of one, who has carried on a correspondence with the officers of the bank; in which the latter recognise the letters addressed in their names to the witness, to be genuine, or paid bills of exchange drawn on them by the witness; 2 Stark. Ev. 372. And such a person, appearing not to have been imposed on by a bad note among so many, may justly be deemed a competent judge of good and bad notes of that bank. But that is not all in
 
 the
 
 case before us. The witness likewise stated, that he formed his opinion also upon the paper, engraving, and general appearance of the bill, as much or more than from the signatures. Now, in point of fact, the hand writing is not the
 
 sole
 
 nor chief criterion, by which persons of business judge whether notes are genuine or counterfeit; but they rely muck on the circumstances mentioned by this witness, and by
 
 them
 
 can often determine the point at a glance, as
 
 one
 
 person is known from another upon sight. Those, who are old enough, cannot but remember that the paper currency, emitted by this State in 1783 and 1785, became so worn in use, that few bills retained the signatures perfectly, and that on most of them they were nearly obliterated. Yet, forming, as they did, the principal part of the stinted currency of that day, many persons of business acquired such an accurate knowledge of the paper and engraving of both the genuine and counterfeit bills? as to be able at once to detect a counterfeit. No doubt that with regard to bank notes, the same is true now, of many persons, who, as merchants and bankers, are daily engaged in handling the notes of particular banks, and have become thoroughly acquainted with their whole appearance. Indeed, in a case, which not unfrequently happens, the form and printing of the bill is the only method of detecting a counterfeit; which is, when a genuine bill of one denomination is altered by extracting by a chemical process one sum, and inserting
 
 *293
 
 a higher. Here the witness had been engaged in the pursuit of a cashier of a bank for ten years, which must have made him as familiar with the faces of these notes as with those of his personal friends, and he swore that he believed that he possessed a correct knowledge of them. We think, therefore, that his testimony properly went to the jury, to be judged of of by them.
 

 Under the first section of the act of 1819, the crime consists in passing as true “a note which the party knew to be forged.” But by the second section, the passing or attempting to pass by one person “
 
 to any other person”
 
 a forged note, knowing it to be forged, constitutes the offence. It is putting spurious paper into circulation, and not defrauding the individual who takes it, that the statute has in view. Hence, upon a similar statute, it was held, that delivering a forged note to an agent, that he might dispose of it in buying goods, was a passing within the act.
 
 Palmer's case,
 
 R. and R. 72. And where the prisoner sold a forged note to a person, employed as an agent by the bank itself to buy it from the prisoner, with the view of detecting him, it was held that the offence was complete.
 
 Holden’s case,
 
 2 Taunt. 334.
 

 The court is, therefore, of opinion, that there is no ground for a
 
 venire de novo.
 

 We have more hesitation on the sufficiency of the indictment. The act of 1819, Rev. St. c. 34, s. 60 enacts, that if any person shall pass any forged bill or note “purporting to be a bill or note issued by order of the president and directors of any bank or corporation within this State or any of fire United States,” he shall be guilty of felony. The indictment describes the note as a false and forged note, “purporting to be a bank note issued by the Planters’ and Mechanics’ bank of South Carolina, the same being a corporation chartered by an act of the General Assembly of the State of South Carolinaand then it sets out the tenor of the note, whereby it appears to run in the name of “ the Planters’ and Mechanics’ bank of South Carolina,” and not “to be issued by order of the president and directors” of that bank.
 

 
 *294
 
 The term
 
 “
 
 purport,” when used in pleading, has a settled signification; which is, that an instrument, when produced, will
 
 appear upon its face
 
 to be the thing it was described as purporting to be. The note, therefore, is, in point of pleading, correctly stated in the indictment to “purport” to be a bank note “issued by the Planters’ and Mechanics’ bank of South Carolinaand if the indictment had described it as “purporting to be issued by the president and directors of the Planters’ and Mechanics’ bank of South Carolina,” or “ by the order of the president and directors,” there would have been a fatal variance between the allegation and the proof and, indeed, a repugnance between the alleged “ purport” of the note, and the “tenor” thereof, as subsequently set forth.
 
 Rex
 
 v. Reading,
 
 2
 
 Leach. 590.
 
 Rex
 
 v. Jones, 1 Doug. 300.
 

 If then, the term “ purporting” be used in the statute in the same sense, in which it is in the indictment, no judgment ought to be passed on the conviction ; for the indictment does not state the “ purport ” to be, and it is seen, from the tenor of the note, that the “purport” is not, that it was issued “by order of the president and directors ” of the bank. But, notwithstanding some doubt to the contrary, we have, after reflection, come to the conclusion, that the word is used by the legislature in an inaccurate and popular acceptation, rather than in its technical sense. It is exceedingly difficult to suppose, that the legislature did use it in a strict legal sense ; for there never has been a bill or note issued by a bank in this State, which purported to be, that is,
 
 upon its face
 
 expressed, that it was issued “by order of the president and directors.” Many of them have run in the name of the president and directors, thus: “ The president and directors of &c., promise to pay &c.” Others have been couched in terms similar to those of the note set out in this indictment; as, for example, “ The Bank of the State of North Carolina promises to pay, &c.” But we have no knowledge of any bank in
 
 this
 
 country, whose notes have been issued in that form, “by order of &c.” The legislature must have been aware of the terms, in which the whole paper currency of the country was expressed; and it is not to be pre-
 
 *295
 
 súmed, that the intention was to make the passing of notes in a certain form, which had never been used, punishable, while the passing of counterfeits, in the form universally adopted, should be dispunishable. Hence the act ought not to read in this last sense, if any other meaning can be given to the language, which will prevent it from being, in effect, inoperative. The definition of “ purport ” by lexicographers is not so precise and restricted, as the meaning affixed to it as a term of art in pleading. It is defined generally, “to mean, to import, to imphj^f The sense is not, therefore, necessarily,
 
 what is expressed on the face
 
 of an instrument; but what is to be understood or implied from it. That it was used in that meaning in this section of the act is to be inferred, not only from the considerations already adverted to, but from the manner in which the same word is used in another part of the same act. The first section is,
 
 “
 
 that if any person shall forge any bill or note in imitation of, or purporting to be, a bill or note issued by order of the president and directors of any bank, &c., he shall be guilty of felony.” Now, it is obvious, that the phrases “in imitation of” and “purporting to be,” are not set in contrast to each other, as meaning different things and constituting two crimes — the one consisting of forging a note “purporting” to be a note “ issued by the order of the president and directors, &c.and the other consisting of forging a note “in imitation of a note issued by order,” &c.: but they are different modes of expressing the same thing, probably intended (by mistake indeed) to express the same thing the more emphatically by repetition. “In imitation of” is used as equivalent to “ similitude or likeness ” in the act of 1811 respecting counterfeiting coin. In that act, an exact similarity is certainly not meant
 
 •
 
 for that would include such a sameness of appearance and material, as would amount to good money, and thus be inconsistent with the idea of counterfeiting, which implies an injurious fraud. But such coin is meant as is not of the value of genuine coin, but resembles it so much as to shew that it was intended to pass for it. So the meaning of the first section of the act of 1819 is to punish the forging of a note, “in
 
 *296
 
 imitation of” or “like” bank notes, which, in the common popn-lar understanding, are issued by orderof the president and directors, because those officers are the managers of the bank. And t{jat jg thug found to be the sense, in which
 
 “
 
 purporting” is to be received in the first section of the act, we may, with equal reason, conclude that it was introduced into the second section to convey the same idea. We admit that it was, as a legal term, very inaccurately used in the act. Indeed, there was no necessity for its introduction into the act, in any sense of it, as it would have been sufficient to say, simply
 
 ‘Mmge
 
 a bank note,” or “a note of any bank incorporated in thi^State or in either of the United States, commonly called a bank note,” or the like; and we should be better satisfied with our judgment, if such had beén the frame of the act. But, for the reasons already given, we think the language was intended to convey the same sense; and therefore the indictment describes the offence, though not in the very same words, accprding to the legal effect of the act, and that is sufficient. Consequently, it must be certified to the Superior Court, that there is no
 
 error
 
 in the judgment.
 

 Pee. CüRiam, Ordered accordingly.